## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

                            :

**JOSEPH MICHAEL ARPAIO**         :

                       :

               **Plaintiff,**      :

                       :   Case No. No. 1:18-cv-02387-APM

**v.**                       :

                       :

**MICHELLE COTTLE, et al.**    :

                       :

               **Defendants**.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

## DEFENDANTS' MOTION TO DISMISS

Defendants Michelle Cottle and The New York Times Company, incorrectly sued as "New York Times" (together, "The Times"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(6), hereby move for dismissal with prejudice of the claims for defamation, tortious interference with prospective business relations, and false light invasion of privacy that are asserted in the Complaint of Plaintiff Joseph "Joe" Arpaio.

In support of this motion, The Times relies on the accompanying Memorandum of Law. As demonstrated in that Memorandum, dismissal of all claims is warranted under Rule 12(b)(6) for two reasons. First, Arpaio is a public figure who has failed to allege facts that could plausibly establish either that the challenged column is substantially false or that The Times published it with the requisite degree of fault, "actual malice" – *i.e.*, that The Times published a false statement about him with knowledge of its falsity or with serious doubts about its truth. In light of the expensive public record supporting the truth of the factual statements in the column, any attempt to amend the Complaint to try to plead actual malice would be futile and dismissal on this basis is

properly with prejudice.  Second, the non-factual opinions offered in the column at issue are not

actionable as defamation in the first instance.  And the tag-along tort claims fail for the same

reasons as the defamation claim.

**REQUEST FOR HEARING**

The Times respectfully requests a hearing on its motion to dismiss.


Dated:  January 4, 2019                                          Respectfully submitted,

                                                                **BALLARD SPAHR LLP**

                                                                  */s/ Jay Ward Brown*
                                                                Jay Ward Brown (D.C. Bar No. 437686)
                                                                Chad R. Bowman (D.C. Bar No. 484150)
                                                                Dana R. Green (D.C. Bar No. 1005174)
                                                                1909 K. Street, NW, 12th Floor
                                                                Washington, D.C. 20006-1157
                                                                Telephone:  (202) 661-2200
                                                                Fax:  (202) 661-2299
                                                                brownjay@ballardspahr.com
                                                                bowmanchad@ballardspahr.com
                                                                greendana@ballardspahr.com

                                                                *Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

                                    :

**JOSEPH MICHAEL ARPAIO**       :

                                :

              **Plaintiff,**     :

                                :     Case No. No. 1:18-cv-02387-APM

**v.**                        :

                                :

**MICHELLE COTTLE, et al.**     :

                                :

             **Defendants**.     :

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFENDANTS' MEMORANDUM OF LAW
## <u>IN SUPPORT OF MOTION TO DISMISS</u>

BALLARD SPAHR LLP

    Jay Ward Brown (D.C. Bar No. 437686)
    Chad R. Bowman (D.C. Bar No. 484150)
    Dana R. Green (D.C. Bar No. 1005174)
    1909 K Street, NW, 12th Floor
    Washington, DC 20006
    Telephone: (202) 661-2200
    Fax: (202) 661-2299
    brownjay@ballardspahr.com
    bowmanchad@ballardspahr.com
    greendana@ballardspahr.com

    *Counsel for Defendants*

Date: January 4, 2019

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .....................................................................................1

RELEVANT BACKGROUND ......................................................................................3

I.      THE COLUMN AT ISSUE ...............................................................................3

II.     THE COMPLAINT ...........................................................................................5

III.    THE PLAINTIFF ..............................................................................................6

        A.      Arpaio's Tenure As Sheriff From 1993-2016.......................................8

                1.      The Tent City Jail................................................................8

                2.      Poor-Quality Food for Inmates ..................................................10

                3.      Denial of Adequate Medical Care to Inmates ...........................12

                4.      Physical Abuse of Detainees......................................................15

                5.      Suicide and Unexplained Deaths ...............................................19

                6.      Chain Gangs.............................................................................19

                7.      Pink Underwear ........................................................................20

                8.      Failure to Investigate Sexual Assaults .....................................21

                9.      Racial Profiling ........................................................................23

        B.      Arpaio's Conviction For Contempt And Subsequent Pardon..............26

        C.      Arpaio's Candidacy For The United States Senate...............................27

ARGUMENT .................................................................................................................27

I.      ARPAIO'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW .......................28

        A.      Arpaio Is Required To But Has Not And Cannot Adequately Plead
                "Actual Malice" As To Any Challenged Statement ...............................29

II.     ARPAIO'S TAG-ALONG CLAIMS ALSO FAIL AS A MATTER OF LAW
        FOR MULTIPLE REASONS...........................................................................38

A.      Both Tag-Along Claims Fail For The Same Reasons As The
        Defamation Claim ................................................................................................38

B.      To The Extent They Are Premised On Additional Statements, Both
        Tag-Along Claims Fail Because Those Statements Are Non-
        Actionable Opinion .............................................................................................40

CONCLUSION ...........................................................................................................................44

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Abbas v. Foreign Policy Grp., LLC*,
    975 F. Supp. 2d 1 (D.D.C. 2013) ...........................................................................43

*Abhe & Svoboda, Inc. v. Chao*,
    508 F.3d 1052 (D.C. Cir. 2007) ...............................................................................6

*Agster v. Maricopa Cty.*,
    486 F. Supp. 2d 1005 (D. Ariz. 2007) .....................................................18, 34, 35

*Agster v. Maricopa Cty. Sheriff's Office*,
    144 F. App'x 594 (9th Cir. 2005) ............................................................................17

*Am. Council of the Blind v. Mnuchin*,
    878 F.3d 360 (D.C. Cir. 2017) ..................................................................................6

*Andrews v. Arpaio*,
    2007 WL 2288144 (D. Ariz. Aug. 8, 2007)............................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................27, 31

*Atencio v. Arpaio*,
    161 F. Supp. 3d 789 (D. Ariz. 2015) ................................................................16, 34

*Ayon v. Arpaio*,
    2010 WL 2671720 (D. Ariz. July 2, 2010) ...........................................................9, 11

*Beeton v. Dist. of Columbia*,
    779 A.2d 918 (D.C. 2001) ........................................................................................30

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................30

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ...................................................................31, 32

*Braillard v. Maricopa Cty.*,
    232 P.3d 1263, 1273 (Ariz. Ct. App. 2010) .......................................................12, 13

*Burnley v. Arpaio*,
    2010 WL 4642110 (D. Ariz. Nov. 9, 2010)............................................................11

*Carrasco v. Arpaio*,
    2007 WL 809861 (D. Ariz. Mar. 15, 2007) ............................................................11

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
    407 F.3d 1220 (D.C. Cir. 2005) ................................................................6

*Demery v. Arpaio*,
    378 F.3d 1020 (9th Cir. 2004) .........................................................10, 11

*\*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) .......................................28, 30, 43

*Doe v. Arpaio*,
    150 P.3d 1258 (Ariz. Ct. App. 2007) ............................................14, 15

*Egiazaryan v. Zalmayev*,
    2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) ..................................31

*Fairbanks v. Roller*,
    314 F. Supp. 3d 85 (D.D.C. 2018) ..............................................6

*\*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ..................................................... passim

*Flanders v. Maricopa Cty.*,
    54 P.3d 837 (Ariz. Ct. App. 2002) .....................................9, 10, 34, 35

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) ....................................................................29

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ..................................................................30

*Grady v. Arpaio*,
    2009 WL 5184359 (D. Ariz. Dec. 23, 2009) ............................11

*Graves v. Arpaio*,
    2008 WL 4699770 (D. Ariz. Oct, 22, 2008) ....................11, 12, 36

*Graves v. Arpaio*,
    633 F. Supp. 2d 834 (D. Ariz. 2009) ......................................11

*Graves v. Arpaio*,
    623 F.3d 1043 (9th Cir. 2010) ...........................................11, 35

*Graves v. Arpaio*,
    48 F. Supp. 3d 1318 (D. Ariz. 2014) ..................................13, 36

*Gray v. Arpaio*,
    2006 WL 1050346 (D. Ariz. Apr. 13, 2006) ........................8

*Grevan v. Arpaio*,
   2013 WL 6670296 (D. Ariz. Dec. 18, 2013) ........................................................................13

*Gross v. N.Y. Times Co.*,
   623 N.E.2d 1163 (N.Y. 1993) ............................................................................................43

*Guilford Transp. Indus., Inc. v. Wilner*,
   760 A.2d 580 (D.C. 2000) .............................................................................................42, 43

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ............................................................................................................29

*Hourani v. Psybersolutions LLC*,
   164 F. Supp. 3d 128 (D.D.C. 2016) ...............................................................................30, 31

*Jankovic v. Int'l Crisis Grp.*,
   822 F.3d 576 (D.C. Cir. 2016) .......................................................................................29, 33

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
   856 F.3d 106 (D.C. Cir. 2017) ...........................................................................................28

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018) .............................................................................................6

*Libre by Nexus v. BuzzFeed*,
   311 F. Supp. 3d 149 (D.D.C. 2018) .................................................................................2, 28

*Libre by Nexus v. BuzzFeed*,
   2018 WL 6573281 (D.D.C. Dec. 13, 2018) .....................................................................6, 32

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003) ...........................................................................................29

*Lucket v. Arpaio*,
   2006 WL 1441031 (D. Ariz. May 22, 2006) ........................................................................11

*Manqual v. Rotger-Sabat*,
   317 F.3d 45 (1st Cir. 2003) ...............................................................................................30

*Mar-Jac Poultry, Inc. v. Katz*,
   773 F. Supp. 2d 103 (D.D.C. 2011) .....................................................................................28

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .....................................................................................24, 25, 33

*Melendres v. Arpaio*,
   989 F. Supp. 2d 822 (D. Ariz. 2013) ...............................................................................24, 33

*Melendres v. Arpaio*,
　　784 F.3d 1254 (9th Cir. 2015) ................................................................24, 25, 33

*Mendiola-Martinez v. Arpaio*,
　　836 F.3d 1239 (9th Cir. 2016) ............................................................................15

*\*Milkovich v. Lorain Journal Co.*,
　　497 U.S. 1 (1990)................................................................................30, 40, 41

*Moldea v. N.Y. Times Co.*,
　　15 F.3d 1137 (D.C. Cir. 1994) ............................................................................38

*Moldea v. N.Y. Times Co.*,
　　22 F.3d 310 (D.C. Cir. 1994) .......................................................................40, 43

*Monitor Patriot Co. v. Roy*,
　　401 U.S. 265 (1971)...........................................................................................30

*Montgomery v. Risen*,
　　197 F. Supp. 3d 219 (D.D.C. 2016) .....................................................................41

*N.Y. Times v. Sullivan*,
　　376 U.S. 254 (1964)....................................................................................29, 30

*Nurriddin v. Bolden*,
　　818 F.3d 751 (D.C. Cir. 2016) ............................................................................27

*Ollman v. Evans*,
　　750 F.2d 970 (D.C. Cir. 1984) ............................................................................41

*Ortega-Melendres v. Arpaio*,
　　836 F. Supp. 2d 959 (D. Ariz. 2011) ..............................................................24, 25

*Parisi v. Sinclair*,
　　845 F. Supp. 2d 215 (D.D.C. 2012) .....................................................................31

*Robertson v. Cartinhour*,
　　867 F. Supp. 2d 37 (D.D.C. 2012).......................................................................32

*Schatz v. Republican Leadership Comm.*,
　　669 F.3d 50 (1st Cir. 2012) ................................................................................31

*Solers, Inc. v. Doe*,
　　977 A.2d 941 (D.C. 2009) ..................................................................................28

*St. Amant v. Thompson*,
　　390 U.S. 727 (1968)....................................................................................30, 33

*Tavoulareas v. Piro*,
 817 F.2d 762 (D.C. Cir. 1987) ............................................30

*Thompson v. Armstrong*,
 134 A.3d 305 (D.C. 2016) ...............................................38

*United States v. Arpaio*,
 2017 WL 3268180 (D. Ariz. July 31, 2017) ....................26, 33

*United States v. Arpaio*,
 2017 WL 4839072 (D. Ariz. Oct. 19, 2017) ...................26, 27

*United States v. Maricopa County*,
 151 F. Supp. 3d 998 (D. Ariz. 2015) ......................25, 26, 33

*United States v. Orozco-Acosta*,
 607 F.3d 1156 (9th Cir. 2010) ............................................6

*Wagner v. Cty. of Maricopa*,
 747 F.3d 1048 (9th Cir. 2013) ......................................20, 35

*Waldbaum v. Fairchild Publ'ns*,
 627 F.2d 1287 (D.C. Cir. 1980) .........................................30

*Ward v. Arpaio*,
 2010 WL 231547 (D. Ariz. Jan. 14, 2010) ...........................11

*Wash. Ass'n for Television & Children v. FCC*,
 712 F.2d 677 (D.C. Cir. 1983) ............................................6

*Weyrich v. New Republic, Inc.*,
 235 F.3d 617 (D.D.C. 2001) .............................................41

*White v. Fraternal Order of Police*,
 909 F.2d 512 (D.C. Cir. 1990) .................................38, 40, 41

*Wilkins v. Arpaio*,
 2011 WL 2198347 (D. Ariz. June 7, 2011) ...........................11

*Williams v. Arpaio*,
 2007 WL 1296997 (D. Ariz. Apr. 30, 2007) .........................11

*Wilson v. Maricopa Cty.*,
 463 F. Supp. 2d 987 (D. Ariz. 2006) ..............................10, 34

## Statutes & Other Authorities

District of Columbia Anti-SLAPP Act, D.C. Code §§ 16-5501 *et seq.*...........................................2

Fed. R. Evid. 201(b).......................................................................................................................6

First Amendment ................................................................................................................. *passim*

Defendants Michelle Cottle and The New York Times Company, incorrectly sued as "New York Times" (together, "The Times") hereby move this Court pursuant to Rule 12(b)(6) to dismiss the Complaint with prejudice.

## PRELIMINARY STATEMENT

This lawsuit arises from a column published by The Times on its editorial pages following Joseph "Joe" Arpaio's loss in the 2018 primary election for the U.S. Senate.  The column is titled, "Well, at Least Sheriff Joe Isn't Going to Congress."  *See* Complaint ("Compl."), Ex. 1 (copy of column).  The long-time Sheriff of Maricopa County, Arizona, Arpaio achieved national fame touting himself as "America's Toughest Sheriff"—and national infamy for overseeing a brutal law enforcement agency that drew thousands of civil rights lawsuits resulting in tens of millions of dollars in legal judgments and settlements.  Among Arpaio's more recent legal transgressions is his conviction in federal court on charges of criminal contempt for continuing a practice of racially based police stops in violation of a judicial order, a conviction erased by a controversial pardon from President Trump.

While Arpaio asserts that the column harmed his "distinguished 55-year law enforcement and political career" and "severely damaged" his reputation with "the Republican establishment" and with "law enforcement," Compl. ¶¶ 18-19, such an assertion is implausible on its face.  The column broke no new factual ground about Arpaio or, as many Arizona officials have described it, his long "reign of terror" as a senior law enforcement official.  The column merely summarized the extensive public record regarding Arpaio's tenure as Sheriff and offered opinions about his political career.  In short, the statements in the column about Arpaio are not only true, but the column also constitutes core political speech protected by the First Amendment.  For this, Arpaio seeks damages "in excess of $147,500,000 USD," challenging numerous statements the truth of which he previously has admitted or that repeat the factual

findings of courts.  As demonstrated below, all apart from the reality that the challenged statements are substantially true as a matter of law, Arpaio's defamation claim should be dismissed with prejudice because, as a public figure, Arpaio was required to but has not pleaded facts plausibly establishing "actual malice" regarding any statements of fact about him—that is, that The Times published a calculated falsehood about him in the column.  Moreover, in light of the extensive public record (including judicial rulings) regarding these matters, he could not amend his Complaint to plead actual malice plausibly.  And the non-factual opinions offered in the column are not actionable as defamation in the first place.  These same principles bar his tag-along claims for tortious interference with prospective business relations and false light.

This lawsuit plainly is an attempt to punish The Times for publishing truthful statements and protected expressions of opinion on a matter of national significance; it appears aimed at imposing costs on a news outlet with which Arpaio disagrees, rather than seeking redress of a legitimate injury.  He all but admits this in publicly soliciting donations, through his counsel, to "TAKE DOWN THE EVIL 'FAKE NEWS' NEW YORK TIMES."  *See* GoFundMe Campaign, *Support Arpaio NY Times Takedown!* (Oct. 31, 2018), https://tinyurl.com/yczl2qnr (explaining that Complaint in this action was "filed as part of Freedom Watch's Leftist Media Strike Force, which seeks to hold the dishonest and unhinged 'fake news' left, and other irresponsible and lawless publications, accountable to the rule of law").  Because this action seeks to punish political speech on a matter of public concern, in addition to filing this motion to dismiss, The Times also is filing a special motion under the District of Columbia Anti-SLAPP Act, D.C. Code §§ 16-5501 *et seq.*[1]

---

[1] The Court has found the Act inapplicable in federal court.  *Libre by Nexus v. BuzzFeed*, 311 F. Supp. 3d 149, 158-61 (D.D.C. 2018) (Mehta, J.).  The Times respectfully brings its separate motion in order to preserve that issue for appeal.

2

## RELEVANT BACKGROUND

**I.      THE COLUMN AT ISSUE**

The day after Arpaio's defeat in the Arizona primary, The Times published the column at issue in this litigation, written by Michelle Cottle, a member of the newspaper's editorial board, titled "Well, at Least Sheriff Joe Isn't Going to Congress."  Compl., Ex. 1 at 1.  A subtitle offered this observation: "Arpaio's loss in Arizona's Senate Republican primary is a fitting end to the public life of a truly sadistic man."  *Id.*  The column is before the Court and speaks for itself, and the Court therefore need not accept any party's characterization of it.  The Times, however, respectfully submits that the column properly can be summarized as follows:

The column begins by reminding readers that Arpaio is the former sheriff of Maricopa County who "so robustly devoted himself to terrorizing immigrants that he was eventually convicted of contempt of court" and then received a controversial Presidential pardon.  The column speculates that Arpaio's loss in the Republican primary meant he had been "cast aside and left to wallow in the knowledge that his moment has passed," which it characterizes as "a fitting end to the public life of a true American villain."  The column then observes that, "[a]s 'America's toughest sheriff,' as Mr. Arpaio liked to call himself, prepares to ride off into the sunset, it bears recalling that he was so much more than a run-of-the-mill immigrant basher," and then provides to readers a brief summary of facts regarding Arpaio's tenure as Sheriff.  It is this summary on which Arpaio's defamation claims in this lawsuit are premised:

> His 24-year reign of terror was medieval in its brutality. In addition to conducting racial profiling on a mass scale and terrorizing immigrant neighborhoods with gratuitous raids and traffic stops and detentions, he oversaw a jail where mistreatment of inmates was the stuff of legend. Abuses ranged from the humiliating to the lethal. He brought back chain gangs. He forced prisoners to wear pink underwear. He set up an outdoor "tent city," which he once referred to as a "concentration camp," to hold the overflow of prisoners. Inmates were beaten, fed

3

> rancid food, denied medical care (this included pregnant women) and, in at least one case, left battered on the floor to die.
>
> Indeed, many prisoners died in Mr. Arpaio's jail—at an alarming clip. The number of inmates who hanged themselves in his facilities was far higher than in jails elsewhere in the country. More disturbing still, nearly half of all inmate deaths on his watch were never explained. Over the years, the county paid out tens of millions in wrongful death and injury settlements.
>
> At the same time, Mr. Arpaio's department could not be bothered to uphold the laws in which it had little interest. From 2005 through 2007, the sheriff and his deputies failed to properly investigate, or in some cases to investigate at all, more than 400 sex-crime cases, including those involving the rape of young children.

*Id.* at 1-2.  The column then asserts that "[i]t was no secret that Mr. Arpaio's methods often crossed the line into the not-so legal," citing a federal judge's ruling in 2011 that Arpaio had engaged in unconstitutional racial profiling.  The column notes that Arpaio "declined" to comply with the court's injunction in that case, and "was found guilty of criminal contempt of court for blatantly thumbing his nose at the law."  *Id.* at 2.

The column then discusses President Trump's swift pardon of Arpaio for that conviction and the controversy that it caused even among Republicans.  It quotes then-Arizona Senator John McCain commenting that the pardon undermined "respect [for the] rule of law, as Mr. Arpaio has shown no remorse for his actions."  *Id.* at 3.  It contextualizes that criticism by quoting from a recent interview Arpaio had provided to *The New York Times*, in which he "rambled" about Mexican criminals and asserted that all "Dreamers" should be deported.

The column acknowledges that "some might consider it ungenerous to celebrate" Arpaio's loss in the primary election, *id.*, but justifies its strong tone on the basis of Arpaio's "long and storied history of mistreating people in unfortunate circumstances."  It concludes with the sentiment that, "[f]or nearly a quarter-century, Sheriff Joe Arpaio was a disgrace to law enforcement, a sadist masquerading as a public servant.  In a just system, we would not see his

like again.  In the current political climate, it may be enough that Arizona Republicans solidly

rejected him." *Id.*

## II.     THE COMPLAINT

Arpaio filed this lawsuit against the column's author, Ms. Cottle, and The New York

Times Company approximately six weeks after the column was published.  In Count I, he alleges

that the specific statements from the column set out in the block quotation above, *supra* at 3-4,

were false and defamatory, Compl. ¶¶ 15, 25, and that these statements harmed his reputation

"both in the law enforcement community . . . as well as with Republican establishment and

donors," thereby undercutting his chances of being elected to Congress in future, *id.* ¶ 14.

Arpaio alleges that the column's summary of the many public controversies and legal troubles

that dogged his career in law enforcement "are defamatory per se because they falsely accuse

Plaintiff Arpaio of committing a serious crime, which amounts to a crime of moral turpitude."

*Id.* at ¶ 26.  Most specifically, the Complaint alleges that the column makes statements that

Arpaio "was directly responsible for numerous inmate deaths during his time as sheriff of

Maricopa County" and "was directly responsible for numerous abused, assaulted, and battered

inmates during his time as sheriff of Maricopa County."  *Id.* at ¶¶ 23-24.

In Count III, he alleges that the same statements, and also additional statements in the

column referring to his pardon, characterizing him as a "true American villain," asserting that his

"methods often crossed the line into the not-so-legal," and describing him as a "disgrace" and a

"sadist," cast him in a false light.  *Id.* at ¶¶ 17, 40.

In Count II, Arpaio alleges that The Times, because of its purported "malice and leftist

enmity," knew of and "sought to destroy" his relationship with the Republican National

Committee "with the publication of the [column]," thereby tortiously interfering with his prospective business relations with the Committee.  *Id.* at ¶¶ 32-35.

Arpaio seeks "actual, compensatory, and punitive damages in excess of $147,500,000 USD."  *Id.* at 9.

## III.    THE PLAINTIFF

The column references and comments upon an extensive public record regarding Arpaio. Because that record demonstrates the futility of any attempt to plead facts that could plausibly establish either "actual malice" or substantial falsity, *see, e.g.*, *Libre by Nexus v. BuzzFeed*, 2018 WL 6573281, at *3 (D.D.C. Dec. 13, 2018), the following summary of events from Arpaio's tenure in public office, which is based on the Complaint, judicial and other government records, and other documents of which this Court may take judicial notice, is necessarily lengthy.[2]

---

[2] On a Rule 12(b)(6) motion, a court may consider not only the pleadings but also matters properly subject to judicial notice.  *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).  A court may judicially notice a fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Here, the Court may take notice of prior judicial proceedings and decisions, *see, e.g.*, *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (taking judicial notice of opinions in other judicial proceedings), and of government publications and statistics, *see, e.g.*, *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 365 nn. 6 & 8 (D.C. Cir. 2017) (taking judicial notice of Treasury statistics and publications); *United States v. Orozco-Acosta*, 607 F.3d 1156, 1164 n.5 (9th Cir. 2010) (taking judicial notice of immigration statistics published online by Department of Homeland Security).  The Court also may take judicial notice of press reports, videos, speeches, and other publicly available materials for the fact of their existence.  *See, e.g.*, *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464-65 (D.C. Cir. 2018) (taking judicial notice of legislative records); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (taking judicial notice of prior news articles on motion to dismiss defamation claims); *Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 683 n.12 (D.C. Cir. 1983) (taking judicial notice of speech by official); *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 88-89 & n.1 (D.D.C. 2018) (taking judicial notice of prior articles and online comments in dismissing defamation claim).  Defendants rely herein on prior published news reports and plaintiff's own public statements not for the truth of the information contained in those reports and statements, but because the very existence of those reports and statements is directly relevant to evaluating whether Arpaio has or plausibly could plead that The Times

(continued...)

Arpaio is one of the most controversial political figures in the United States.  He served as the chief law enforcement officer of Maricopa County for 24 years, before turning his attention to candidacy for the United States Senate.  Throughout his career, he has courted publicity, styling himself as "American's Toughest Sheriff."  He has given innumerable interviews and speeches, appeared in multiple documentaries[3] and broadcasts,[4] and is the co-author of two books about his muscular approach to law enforcement: *America's Toughest Sheriff: How to Win the War Against Crime* (1996) and *Joe's Law: America's Toughest Sheriff Takes on Illegal Immigration, Drugs and Everything Else That Threatens America* (2008).

While Arpaio has billed his approach to law enforcement as "tough," numerous critics have alleged that he implemented nothing short of a "reign of terror" through his official position in the Maricopa County Sheriff's Office ("MCSO"), under which individual rights were trampled and mistreatment of inmates was rife.[5]  Arpaio's tactics have been the subject of federal

---

(...continued)
published the column with actual malice, as The Times explains more fully in its argument below. The voluminous materials cited herein are publicly available online, but The Times would be happy to file and serve copies of the cited materials if that would be helpful to the Court.

[3] *See, e.g.*, *The American Detention Machine*, The Atlantic (Feb. 23, 2018), https://tinyurl.com/y72rdyxf; *The Joe Show* (2014), https://tinyurl.com/ybpxer9b; *Two Americans* (2012), http://www.twoamericans.com; *Joe Arpaio - toughest sheriff of the states* (2010), https://tinyurl.com/y8n5557c; *The Toughest Sheriff in America* (2001), https://vimeo.com/88253188; *The Chain Gang*, ABC Australia (1999), https://tinyurl.com/ycxe2pgs.

[4] *See, e.g.*, *Interview with Joe Arpaio*, The Colbert Report (Apr. 20, 2009)*, https://tinyurl.com/ya3ej6yc; *Joe Arpaio: Bernie Sanders Should Be A Man and Come Out Here*, MSNBC (Mar. 21, 2016), https://tinyurl.com/yajxzcx6; *Pamela Anderson visits Tent City Jail*, Fox 10 (Apr. 15, 2015), https://tinyurl.com/ybfmbjro.

[5] *See, e.g.*, Celeste Fremon, *Living Under Joe Arpaio's 'Reign of Terror'*, The Crime Report (Aug. 29, 2017), https://tinyurl.com/y7244flq (interview with former Chief of Mesa, Arizona police department, stating that "I lived around the reign of terror of Joe Arpaio for three years.  I saw firsthand the number of constitutional violations that were being committed by Joe almost

(continued...)

enforcement actions and literally thousands of civil lawsuits.[6]  Maricopa County has paid tens if

not hundreds of millions of dollars in judgments, settlements, and costs arising out of MCSO

abuses during Arpaio's tenure—including an estimated $120 million for racial profiling cases

alone.[7]

### A.    Arpaio's Tenure As Sheriff From 1993-2016

Arpaio became Sheriff of Maricopa County, Arizona, in 1992.  He was re-elected five

times and served in that office until 2016.  Throughout his tenure, policies and practices that

Arpaio implemented or oversaw prompted controversy and litigation, which in turn often

resulted in national and international media coverage of Arpaio and MCSO.  These public

controversies and lawsuits include each of the subjects of the column challenged here by Arpaio.

### 1.    <u>The Tent City Jail</u>

Arpaio first garnered national attention in 1993, when he implemented an open-air jail in

response to "overflowing" conditions in the county facility.  *See* MCSO News Release, *Tent City*

*Jail: 23 Years and Counting* (Aug. 3, 2016) ("MCSO News Release"),

---

(...continued)
on a daily basis."); William Finnegan, *Sheriff Joe*, The New Yorker (July 20, 2009),
https://tinyurl.com/y8zeceuy (quoting Phoenix Mayor Phil Gordon stating that Arpaio "imposed
a 'reign of terror.'").

   [6] *See, e.g.*, *Gray v. Arpaio*, 2006 WL 1050346, at *1 (D. Ariz. Apr. 13, 2006) (noting that
more than 1,000 civil rights actions were filed by MCSO jail inmates in just one two-year
period).  According to the *Phoenix New Times*, between 2004 and 2007 there were 2,150 federal
lawsuits filed against MCSO over the conditions of the jails, which at the time housed an average
of 9,200 inmates a day.  During that same period, by comparison, the sheriff's offices in New
York City, Los Angeles, Chicago and Houston were the targets of just 43 federal lawsuits—
*combined*.  At the time, those counties housed a combined average of roughly 61,000 inmates a
day.  *See* John Dickerson, *Inhumanity Has a Price*, Phoenix New Times (Dec. 20, 2007),
https://tinyurl.com/ybcwr4gr.

   [7] *See, e.g.*, James King, *Joe Arpaio: 'America's Toughest Sheriff' Comes at a Hefty Price*,
Vocativ (Apr. 3, 2015), https://tinyurl.com/ybanmgjs; Laurie Roberts, *Joe Arpaio just cost us
another $30 million*, The Arizona Republic (May 22, 2018), https://tinyurl.com/y7pxe964.

https://tinyurl.com/y8tf2pzw.  Officials referred to the complex as "Tent City."  *Id.*; *see also*

*Ayon v. Arpaio*, 2010 WL 2671720, at *1 (D. Ariz. July 2, 2010); *Flanders v. Maricopa Cty.*, 54

P.3d 837, 840 (Ariz. Ct. App. 2002) (plaintiff "was an inmate in the jail facility known as 'Tent

City' because prisoners are housed in tents."); *id.* at 843 ("Sheriff Arpaio had conceived the idea

for housing inmates in tents . . . .  After he was elected, he created Tent City.").  Arpaio gave

numerous interviews regarding Tent City and personally conducted numerous on-camera tours.[8]

For years, Arpaio hosted an annual "birthday" party to celebrate the opening of Tent City.[9]

      Arpaio publicly touted the harsh living conditions in this penal facility.  According to a

press release issued to celebrate an anniversary, "[t]emperatures in the tents have reached as high

as 130 degrees."  MCSO News Release, https://tinyurl.com/y8tf2pzw at 2.  Arpaio even referred

to Tent City in a 2008 speech as a "concentration camp."  Recordings of the speech remain

available online.[10]  In a 2018 interview, Arpaio reaffirmed this startling characterization: "I'm

not going to back down.  So what?  Maybe it is a concentration camp; I don't want to make it

look nice."[11]

---

[8] *See, e.g.*, *Joe Arpaio: Bernie Sanders Should Be A Man and Come Out Here*,
https://tinyurl.com/yajxzcx6;  *Pamela Anderson visits Tent City Jail*,
https://tinyurl.com/ybfmbjro; *Sheriff Joe Arpaio celebrates 21st anniversary of Tent City*, ABC15
(Aug. 3, 2014), https://tinyurl.com/ycw34338; *The Toughest Sheriff in America*,
https://vimeo.com/88253188 at 10:00-11:10.

[9] *See, e.g.*, Devin Browne, *Phoenix Tent City Jail Celebrated Anniversary*, KJZZ FM (Aug.
4, 2011), https://tinyurl.com/yd6lfb5q; *Sheriff Joe Arpaio celebrates 21st anniversary of Tent
City*, https://tinyurl.com/ycw34338; *Sheriff Arpaio celebrates 22 years in Tent City*, ABC15
(Aug. 3, 2015), https://www.youtube.com/watch?v=JGlD1MployU.

[10] *See, e.g.*, *Joe Arpaio: Tent City a 'Concentration Camp'*, Phoenix New Times (Aug. 2,
2010), https://www.phoenixnewtimes.com/news/joe-arpaio-tent-city-a-concentration-camp-
6500984.

[11] *The American Detention Machine*, https://tinyurl.com/y72rdyxf at 12:24-12:59.

The harsh and dangerous living conditions in Tent City prompted significant criticism and litigation over the years.  In 2002, a jury entered judgment against Arpaio in his official capacity, finding that he created and was responsible for conditions in Tent City so dangerous that they that violated inmates' civil rights.  The Arizona Court of Appeals affirmed the judgment:

> The Sheriff admitted knowing about, and in fact intentionally designing, some conditions at Tent City that created a substantial risk of inmate violence: i.e., the lack of individual security and inmate control inherent in a tent facility; the small number of guards; a mixed inmate population subject to overcrowding, extreme heat, and lack of amenities. . . . [T]he evidence concerning unsafe conditions in Tent City was essentially undisputed, even by jail authorities.  The evidence was abundant that authorities were aware of and ignored grave risks to life and limb at Tent City. . . .  The jury could properly determine that the Sheriff was callously indifferent to the Eighth Amendment's requirements and to the exposure of Tent City inmates to serious injury.

*Flanders*, 54. P.3d at 846; *see also Wilson v. Maricopa Cty*., 463 F. Supp. 2d 987, 994 (D. Ariz. 2006) ("Plaintiffs have presented sufficient evidence for a reasonable jury to find deliberate indifference on the part of Sheriff Arpaio, the County's final policymaker for Tent City" with regard to dangerous living conditions).

## 2.  <u>Poor-Quality Food for Inmates</u>

Arpaio also made various public statements asserting that he intentionally served cheap and poor quality food as part of his "tough" regime for detainees.  *See, e.g.*, *The American Detention Machine*, https://tinyurl.com/y72rdyxf at 2:42 (Arpaio displaying parody of hotel road sign, posted at MCSO Jail, offering "35¢ meals" to inmates); *Flanders*, 54. P.3d at 842 (finding that, during civil litigation, "Sheriff [Arpaio] acknowledged that he had said that he may spend more to feed his dogs than it costs to feed inmates."); *Joe Arpaio - toughest sheriff of the states*, https://tinyurl.com/y8n5557c at 6:02-6:14 (video interview in which Arpaio claims to spend more feeding his dogs than inmates).  Indeed, Arpaio said he fed inmates rotten food—including

"green bologna."  *See, e.g.*, *Demery v. Arpaio*, 378 F.3d 1020, 1025 (9th Cir. 2004) (finding that, in 2004, Arpaio maintained Crime.com website on which he claimed inmates "eat green bologna"); Sadhbh Walshe, *Joe Arpaio, Maricopa County's king of cruel*, The Guardian (June 27, 2012), https://tinyurl.com/y7lekqav ("Arpaio has boasted in the past of the food being rotten; green bologna is a specialty.").

Unsurprisingly, numerous lawsuits filed against Arpaio included allegations that jail food under his watch was inedible.[12]  Plaintiffs often prevailed.  In 2008, for example, a federal court held that the food service in the Maricopa jails constituted an ongoing violation of inmates' constitutional rights.  *See generally Graves v. Arpaio*, 2008 WL 4699770 (D. Ariz. Oct, 22, 2008).  The court found that detainees under Arpaio's supervision were "often given food that is overripe, moldy, and generally inedible," and that the food did not meet minimum nutritional requirements for health.  *Graves v. Arpaio*, 623 F.3d 1043, 1050 (9th Cir. 2010); *see also Graves v. Arpaio*, 633 F. Supp. 2d 834, 849 (D. Ariz. 2009) (MCSO's "dietician's opinion that pretrial detainees are served adequate nutrition is not supported by the evidence, is contrary to evidence, and is unworthy of belief.  The Court does not believe it.").  The federal court ordered Arpaio to bring the jail's food into compliance with the Department of Agriculture's Dietary Guidelines for nutritional health.  2008 WL 4699770, at *46, *aff'd*, 623 F.3d 1043.

---

[12] *See, e.g.*, *Wilkins v. Arpaio*, 2011 WL 2198347, at *1 (D. Ariz. June 7, 2011) (alleging "spoiled food and polluted water"); *Burnley v. Arpaio*, 2010 WL 4642110, at *3 (D. Ariz. Nov. 9, 2010) (alleging "inadequate calories and spoiled food"); *Ward v. Arpaio*, 2010 WL 231547, at *2 (D. Ariz. Jan. 14, 2010) (alleging inmate meals "contain old or rotten food"); *Ayon*, 2010 WL 2671720, at *2 (alleging "Arpaio makes the food 'as rotten as possible.'"); *Grady v. Arpaio*, 2009 WL 5184359, at *2 (D. Ariz. Dec. 23, 2009) (alleging "meals are too small and contain old or rotten food."); *Andrews v. Arpaio*, 2007 WL 2288144, at *1 (D. Ariz. Aug. 8, 2007) (alleging "inedible food, and rotten meat"); *Williams v. Arpaio*, 2007 WL 1296997, at *1 (D. Ariz. Apr. 30, 2007) (alleging "inadequate and spoiled food"); *Carrasco v. Arpaio*, 2007 WL 809861, at *1 (D. Ariz. Mar. 15, 2007) (alleging meals "consist of rotten meat and are frequently inedible"); *Lucket v. Arpaio*, 2006 WL 1441031, at *1 (D. Ariz. May 22, 2006) (alleging food was "rotten").

### 3.    Denial of Adequate Medical Care to Inmates

The persistent denial of adequate medical care to MCSO inmates throughout Arpaio's tenure was the subject of a federal investigation, county investigations, extensive civil litigation, and widespread press coverage.  A 1996 DOJ investigation of MCSO "concluded that unconstitutional conditions existed at the [MCSO] Jails with respect to . . . deliberate indifference to inmates' serious medical needs."  *Braillard v. Maricopa* Cty, 232 P.3d 1263, 1273 (Ariz. Ct. App. 2010).  In response, "[i]n 1999, Arpaio and the County signed a settlement with DOJ, agreeing that 'MCSO staff would report inmates' apparent serious medical needs to CHS staff' and that 'ongoing training would be provided continuously during employment of all detention officers . . .  on rights and responsibilities of inmates; . . .  crisis intervention; and recognition of the signs and symptoms of chemical dependency.'"  *Id.* (alterations omitted).

A consultant hired by Maricopa County to review the adequacy of medical treatment in MCSO jails four years later, in 2003, found that "the current correctional health care program at Maricopa County was not in compliance with the basic health care rights provided to inmates under the U.S. Constitution."  *Id.* at 1274 (alteration omitted).  He further found that "sick call requests are not responded to in a timely manner" and "the number of nursing personnel generally [was] inadequate."  *Id.* at 1275.

A federal court tasked with implementing a consent decree found in 2008 that the poor standard of medical care in MCSO jails under Arpaio's control constituted "continuing and ongoing violations of pretrial detainees' constitutional rights."  *Graves*, 2008 WL 4699770, at *28.  Among other things, the court made factual findings that "pretrial detainees with chronic medical problems, such as diabetes, hypertension, and HIV disease, often do not receive their medications in a timely manner"; that pretrial detainees "may not receive any care for at least two weeks"; and that "detainees frequently are denied access to adequate medical, mental health,

and dental care because they do not receive a timely in-person assessment." *Id.* at *27-29.  The

former medical director within MCSO jails provided sworn testimony in 2008 that, when he was

appointed four years earlier, the jail health service "'w[as]n't anywhere close to' adequate

staffing and was 'deliberately indifferent to the needs of its patients.'" *Braillard*, 232 P.3d

at 1275.  The same year, the National Commission on Correctional Health Care (NCCHC)

terminated its accreditation for MCSO jails "for failure to maintain compliance with national

standards and providing false information about such compliance." *See* Letter from NCCHC to

Arpaio (Sept. 25, 2008), https://tinyurl.com/ybh35mat.

Later legal proceedings resulted in factual findings that Arpaio had failed to demonstrate

that detainees with serious health needs were, on a consistent basis, seen by medical providers or

receiving appropriate laboratory tests or medication.  *Graves v. Arpaio*, 48 F. Supp. 3d 1318,

1341-42 (D. Ariz. 2014).  The court further found that the screening, segregation, and treatment

procedures for physical and mental illnesses at MCSO jails failed to meet court-ordered

standards.  *Id.* at 1346-48.

Civil lawsuits against Arpaio and Maricopa County have included allegations of denial of

adequate medical treatment, in some cases resulting in death.  Maricopa County settled many of

the claims for substantial sums.[13]  A number of pregnant detainees also have alleged inadequate

medical care or denial of medical care in MCSO custody:

---

[13] *Compare, e.g. Braillard*, 232 P.3d at 1268 (claim that MCSO failed to provide insulin to insulin-dependent diabetic inmate and failed to respond to urgent requests for medical care leading to her death from diabetic ketoacidosis) *with* Stephen Lemons, *Joe Arpaio's Victim Deborah Braillard: Family Agrees to $3.2 Million Settlement, ABC15 Reports*," Phoenix New Times (Oct. 17, 2012), https://tinyurl.com/ybe3oaob; *Grevan v. Arpaio*, 2013 WL 6670296, at *1 (D. Ariz. Dec. 18, 2013) (claim that detainee died as result of inadequate medical treatment of drug withdrawal) *with* Megan Cassidy, *County OKs $1.1M for family of woman who died in MCSO custody*, The Arizona Republic (Mar. 26, 2014), https://tinyurl.com/y7xvxfko (reporting on settlement of *Grevan* lawsuit); *Torrez v. Arpaio*, 2:2014-cv-02337 (D. Ariz. 2014) (claim that

(continued...)

- In 2008, inmate Ambrett Spencer filed a lawsuit against Arpaio and MCSO staff. *Spencer v. Arpaio*, CV2008-008946 (Ariz. Super. Ct. 2008).  Spencer alleged that when she was nine months pregnant she suffered a placental abruption and that MCSO staff ignored her pleas for help and delayed seeking medical treatment, leading to the death of her unborn daughter.  *See* John Dickerson, *Arpaio's Jail Staff Cost Ambrett Spencer Her Baby, and She's Not the Only One*, Phoenix New Times (Oct. 30, 2008), https://tinyurl.com/ybwzxhro.

- The *Phoenix New Times* reported that a pregnant MCSO detainee named Michelle McCollum submitted an affidavit in federal proceedings alleging that, while awaiting trial in 2005, she was attacked by two other inmates and repeatedly punched in the stomach.  *Id.*  McCollum miscarried as a result of the attack.  *Id.* She alleged that MCSO officers ignored her pleas for medical attention for three days and then failed to return her to the hospital for follow-up treatment.  *Id.*  She ultimately suffered a hemorrhage requiring an emergency blood transfusion.  *Id.*

- Courts held that Arpaio repeatedly attempted to prevent pregnant detainees from obtaining abortion medical services.  Indeed, Arpaio denied elective abortion procedures to pregnant detainees until enjoined from doing so by the federal courts.  *Doe v. Arpaio*, 150 P.3d 1258, 1267 (Ariz. Ct. App. 2007) (affirming

---

(...continued)

detainee died after he received inadequate medical care for stomach ulcer and detention officers ignored his pleas for help) *with* Miriam Wasser, *$1 Million Settlement in MCSO Wrongful Death Suit*, Phoenix New Times (June 26, 2015), https://tinyurl.com/ybvzqmnu (reporting on settlement of the *Torrez* lawsuit); *Kramer v. Maricopa Cty.*, No. CV2016-016687 (Super. Ct. Ariz. 2016) (claim that detainee died due to denial of medical care) *with* Uriel Garcia, *County supervisors approve $300K settlement in Arpaio-era jail death*, The Arizona Republic (Nov. 28, 2018) (reporting on settlement of *Kramer* claim), https://tinyurl.com/yaxz6u6r.

permanent injunction against County's policy of requiring inmates to obtain court order before being permitted to obtain abortion).  Arpaio then refused detainees access to abortion care unless detainees pre-paid the costs of transportation and security.  *See Doe v. Arpaio*, CV2004-00928 (Ariz. Super. Ct.).  In 2009, an Arizona court enjoined him from requiring detainees to prepay for abortion care.  *See Court Rules that Sheriff Joe Arpaio Can No Longer Block Prisoners' Access To Abortion Care*, ACLU (Oct. 20, 2009), https://tinyurl.com/y8v6ywvk.

- In 2011, a female inmate sued Arpaio, asserting that MCSO officers violated her civil rights by placing her in shackles while she was in labor and after giving birth.  *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1243-45 (9th Cir. 2016).  The Ninth Circuit recognized substantial evidence that shackling at any point during labor or postpartum recovery poses a significant health hazard.  *Id.* at 1251-56.  The case reportedly settled for $200,000, with Arpaio agreeing to prohibit deputies from restraining female inmates during labor and delivery.  Jacques Billeaud, *Maricopa County to pay $200,000 to settle lawsuit over restraining pregnant inmate*, Associated Press (Nov. 21, 2016), https://tinyurl.com/y7bh4fnk.

### 4.  Physical Abuse of Detainees

Numerous plaintiffs have alleged in civil lawsuits against Arpaio and Maricopa County that MCSO officers physically abused and assaulted detainees, in some cases resulting in permanent disability or death.  Allegations that Arpaio and MCSO abused detainees have been

covered extensively in the local and national press, throughout Arpaio's tenure as sheriff.[14]
Representative cases of which the court may take judicial notice include:

- **Ernest "Marty" Atencio**, a mentally ill military veteran, died in MCSO custody
  in 2011 after a misdemeanor arrest.  *Atencio v. Arpaio*, 161 F. Supp. 3d 789,
  794-96 (D. Ariz. 2015).  According to the complaint and a surveillance video
  produced in discovery, MCSO officers restrained him in a "dogpile," punched
  him in the face, and repeatedly shocked him with Taser guns when he refused to
  take off his shoes.  *Id.* at 796.  MCSO officers then carried him to a cell, stripped
  him naked, and left him on the floor unconscious, where he died.  *Id.*  The
  surveillance video of the attack, showing Atencio naked on the floor and dying, is
  publicly available to this day.  *See* Stephen Lemons, *Joe Arpaio's Victim Marty
  Atencio in MCSO's 'Safe Cell'*, Phoenix New Times (Dec. 27, 2011),
  https://tinyurl.com/ycytl6az; *MCSO Video of Ernest Atencio in Custody, Part 2
  (raw)*, https://tinyurl.com/y9c55btq.  Maricopa County reportedly paid $7 million
  to Atencio's family.  *See* Megan Cassidy, *$7 million settlement approved in
  Arpaio-era jail death*, The Arizona Republic (Mar. 7, 2018),
  https://tinyurl.com/yaaydvhf.

---

[14] *See, e.g.*, Tony Ortega, *Fed Up*, Phoenix New Times (Dec. 10, 1998),
https://tinyurl.com/y9qf92jh; *$2M settlement in Maricopa jail death*, Associated Press (Jan. 15,
2008), https://tinyurl.com/y7ojnyh6; Jacques Billeaud, *Maricopa sheriff lawsuits cost taxpayers
millions*, Associated Press (Jan. 27, 2014), https://tinyurl.com/y7pzmtaz; *$7M settlement in
man's death at jail run by then-sheriff Joe Arpaio*, CBS News (Mar. 7, 2018),
https://tinyurl.com/y8xyapj2; Megan Cassidy, *After recent $7 million settlement, a look at 5
other payouts from Arpaio-era jail deaths*, The Arizona Republic (Mar. 9, 2018),
https://tinyurl.com/y9c7kew3; *County supervisors approve $300K settlement in Arpaio-era jail
death*, https://tinyurl.com/yaxz6u6r.

- **Juan Mendoza Farias** died in MCSO custody in 2007.  Through public-records litigation, the *Phoenix New-Times* obtained thousands of pages from an internal investigation and surveillance videos of Farias in custody.  *See* John Dickerson, *Sheriff Joe Arpaio's Own Records Raise Serious Questions About Inmate Juan Mendoza Farias' Violent Death*, Phoenix New Times (Nov. 20, 2008) ("*Serious Questions*"), https://tinyurl.com/yaffkkyg.  Those records show that Farias died after he was shot with pepper balls, hit with a Taser, restrained under a "dog pile" of MCSO officers, and then left naked and immobile alone on the floor of an isolation cell.  *Id.*  Video of Farias left naked on the floor is available online. *Events That Led To Suspicious Death in Arpaio's Jail*, https://tinyurl.com/yam8q48j.  He was pronounced dead early the next morning. *See Serious Questions.  See also* John Dickerson, *Was Juan Mendoza Farias beaten to death by Sheriff Joe Arpaio's guards?*, Phoenix New Times (Sept. 11, 2008), https://tinyurl.com/yade4cdv.  Maricopa County reportedly paid Farias' family $1 million.  *$1 Million Settlement in Maricopa County, Arizona Jail Prisoner's Beating Death*, Prison Legal News (July 15, 2012), https://tinyurl.com/y9o2lzf8.

- **Charles Agster**, a mentally handicapped man, died in MCSO custody in 2001, after an arrest for misdemeanor trespass.  *Agster v. Maricopa Cty. Sheriff's Office*, 144 F. App'x 594, 596 (9th Cir. 2005).  Surveillance video shown at trial revealed that, in custody, MCSO officers handcuffed him, placed a hood over his head, strapped him into a restraining chair, and forced his head between his legs, leading to asphyxiation and death.  *See* John Dougherty, *Death Sentence*, Phoenix

New Times (Mar. 16, 2006), https://tinyurl.com/yb3ujyzf.  A jury awarded $9

million to Agster's estate.  *See Agster v. Maricopa Cty.*, 486 F. Supp. 2d 1005,

1009-10 (D. Ariz. 2007).

- **Scott Norberg** died in MCSO custody in 1996.  *See Norberg v. Maricopa*

  *County, et al.*, Case No. CIV 97-0866-PHX-PGR (Maricopa Cty. Super. Ct.).

  Surveillance video obtained by the press showed him being beaten and repeatedly

  shocked with Taser guns by multiple MCSO officers; he was then restrained until

  he asphyxiated to death.  David Holthouse, *Murder on Madison: The Norberg*

  *Remix*, Phoenix New Times (Apr. 15, 1999), https://tinyurl.com/yc4j2ucz; *see*

  *also The Toughest Sheriff in America*, https://vimeo.com/88253188 at 38:23-

  43:19 (surveillance video, video interviews with and depositions of witnesses to

  Norberg's death, and autopsy photos showing severe bruising to Norberg's face

  and body).  In 1999, Maricopa County paid $8.25 million to settle claims arising

  from his death.  *See* Tony Ortega, *The $8 Million Victim*, Phoenix New Times

  (Jan. 14, 1999), https://tinyurl.com/yd832qb2.

- **Brian Crenshaw**, who was legally blind and mentally disabled, died in 2003 in

  MCSO custody after a shoplifting arrest.  *Evans v. Maricopa Cty.*, CV2004-

  004221 (Super. Ct. Ariz. 2004).  While detained in solitary confinement, he

  allegedly was denied food and severely beaten by MCSO officers; he died from

  complications due to internal injuries.  The County reportedly settled the case for

  $2 million shortly before trial.  Mark Flatten, *County to pay $2M in death of*

  *jailed man*, East Valley Tribune (Jan. 14, 2008), https://tinyurl.com/yab86u5r.

### 5.   Suicide and Unexplained Deaths

According to records from the Office of the Maricopa County Medical Examiner, the Office of Risk Management, and the U.S. Department of Justice, at least 157 people died in Maricopa jails under Arpaio's supervision.  Michael Lacey, *Prisoners Hang Themselves in Sheriff Joe Arpaio's Jails at a Rate That Dwarfs Other County Lockups*, Phoenix New Times (Nov. 24, 2015), https://tinyurl.com/y7saw5ds.  The *New Times* reported that records from the coroner's office indicated that 24 percent of deaths were by suicide, an extremely high rate compared to cities like Los Angeles (11%) or New York (9%).  *Id.*  The *New Times* further reported that, according to the same coroner's records, 73 of 157 deaths—almost half—had no listed explanation at all.  *Id.*

Pursuant to the Death in Custody Reporting Act of 2000, the DOJ Bureau of Justice Statistics ("BJS") collects individual data on deaths in custody in local jails and state prisons. *See* https://tinyurl.com/y846jqx2.  BJS data similarly indicates that detainees in Maricopa County committed suicide at far higher rates than in other large jurisdictions.  In Maricopa County the average annual mortality rate for 2000-2002 was 45 per 100,000 inmates; 32% of all detainee deaths were classified as suicide.  *See* DOJ Bureau of Justice Statistics, *Special Report: Suicide and Homicide Rates in State Prisons and Local Jails* (Aug. 2005), https://tinyurl.com/yajauwaz, at 4.  In comparison, the average for Los Angeles was 21 deaths per 100,000 inmates (11.6%) and for New York 20 deaths per 100,000 inmates (9%).  *Id.*

### 6.   Chain Gangs

In the 1990s, Arpaio reintroduced chain gangs.  The practice has been the subject of widespread media coverage and Arpaio has given numerous interviews regarding the practice. He bragged that "I take the credit" for implementing the chain gang and "it will be here as long as I'm the sheriff."  *The Chain Gang*, https://tinyurl.com/ycxe2pgs at 0:32-0:49 (video interview

of Arpaio); *see also An interview with America's toughest sheriff*, Toronto Star (May 27, 2013),

https://tinyurl.com/y9s26gco at 0:56-1:23 (video interview of Arpaio claiming he operates the

only female chain gang in world); *The Toughest Sheriff In America*, https://vimeo.com/88253188

at 03:55-08:25 (interview of Arpaio and video footage of female chain gang); *id.* at 09:23-09:43

(video of Arpaio stating "I love the chain gang."); *id.* at 11:58-13:00 (video of chain gang at

work); *Joe Arpaio - toughest sheriff of the states*, https://tinyurl.com/y8n5557c at 1:13-1:55

(video interview of Arpaio regarding chain gang).

### 7.    Pink Underwear

Also in the 1990s, MCSO began issuing pink underwear to inmates.  The pink underwear

has been the subject of extensive news reporting:  A Westlaw news search for "Arpaio" and

"pink underwear" returns more than 1,500 articles.  It also was the subject of a federal lawsuit.

*See Wagner v. Cty. of Maricopa*, 747 F.3d 1048, 1051 (9th Cir. 2013).  Arpaio embraced the

pink underwear as an emblem of his approach to law enforcement and offered replicas for sale,

with proceeds allegedly supporting law enforcement foundations.  *See, e.g.*, Tony Ortega,

*There's No Accounting for Joe's Posses*, Phoenix New Times (Nov. 14, 1996),

https://tinyurl.com/ydbfpp8x (reporting on public records of sales of pink underwear).

Arpaio bragged in a 2009 interview, "[A]s far as the pink underwear, I guess I'll go down

in history. . . .  They'll remember me because of the pink underwear."  *Sheriff Arpaio: "I could

be elected on pink underwear"* (Oct. 16, 2009), https://tinyurl.com/yda4tqb4.  Arpaio explained

that he selected the undergarment color for inmates under his supervision because "they hate

pink, at least in this county.  So you never give them anything they like.  So if they don't like

pink, that's why they have pink."  *Id.* at 0:35-0:45.

### 8.   <u>Failure to Investigate Sexual Assaults</u>

The Associated Press obtained the release of police records in 2011 that showed that "more than 400 sex-crimes reported to [MCSO] during a three-year period ending in 2007— including dozens of alleged child molestations— . . . were inadequately investigated and in some instances not [investigated] at all."  Jacques Billeaud, *Critics: 'tough' sheriff botched sex-crime cases*, Associated Press (Dec. 4, 2011), https://tinyurl.com/yarwl3t7.  Among the crimes MCSO reportedly failed to investigate was the sexual abuse of a three-year-old.  *Id.* at 2.

Some of the uninvestigated crimes occurred in El Mirage, a city that had contracted with Maricopa County to provide police services.  When the contract ended in 2007, El Mirage police took over case files—and publicly criticized the failure to investigate.  An El Mirage detective stated that he "learned from a sheriff's summary of 50 to 75 case files he picked up from Arpaio's office that an overwhelming majority hadn't been worked.  That meant there were no follow-up reports, no collection of additional forensic evidence and zero effort after the initial report of the crime was taken."  Jacques Billeaud, *Sheriff Arpaio staff accused of botching sex cases*, Associated Press (Dec. 5, 2011), https://tinyurl.com/y8aebsl5.  The El Mirage assistant police chief believed that "the decision to ignore the cases was made deliberately by supervisors in Arpaio's office."  *Id.  See also* JJ Hensley & Rob O'Dell, *Republic review of sex-crime cases finds failures by Maricopa County Sheriff's Office*, The Arizona Republic (Sept. 29, 2012), https://tinyurl.com/yc3rf2as.

Two days after publication of the Associated Press report, Arpaio made a public apology to the victims.  *See Amid Calls for His Resignation, Arpaio Apologizes for the Mishandling over 400 Sex-Crime Cases*, Fox News (Dec. 6, 2011), https://tinyurl.com/ybguzol9; *see also MCSO apologizing for ignored sex crime cases*, ABC15 (Dec. 5, 2011), https://tinyurl.com/y969cz92 (televised statements by Maricopa County Captain Steve Whitney that "some cases were

investigated but not thoroughly investigated or weren't investigated at all" and by Arpaio that

"[i]f there were any victims out there, I apologize . . . Hope that this never happens again.

Sometimes in a large law enforcement agency, these situations occur.").  The MCSO reportedly

confirmed that from 2005 to 2007 its special victims unit failed to investigate 432 alleged sex

crimes and that detectives improperly closed more than 200 of those investigations as solved,

when they were not.  *Id.*; Ryan Gabrielson, *New sex crime arises after Arpaio fails to investigate*

*alleged rape*, Tuscon Sentinel (Dec. 11, 2011), https://tinyurl.com/7qt2h8n.  Prominent Arizona

politicians called for Arpaio's resignation and for an investigation.  *See, e.g.*, David Schwartz,

*Arizona senators concerned over sex crime probes*, Reuters (Dec. 8, 2011),

https://tinyurl.com/yacbfgna; Eyder Peralta, *Arizona Sheriff Joe Arpaio Under Fire For*

*Mishandled Sex-Crime Cases*, NPR (Dec. 8, 2011), https://tinyurl.com/y8ekka8h.

 The U.S. Department of Justice ("DOJ") soon thereafter released the results of its own

investigation.  Among other things, DOJ announced that "the investigation uncovered additional

areas of serious concern, including . . . [f]ailure to adequately investigate allegations of sexual

assaults."  Press Release, *DOJ Releases Investigative Findings on the Maricopa County Sheriff's*

*Office* (Dec. 15, 2011), https://tinyurl.com/y88sn7da.

 The family of a 13-year-old girl, one of the more than 400 alleged crime victims whose

cases were the subject of the Associated Press' extensive reporting, filed a lawsuit in 2013.  *See*

*In the Matter of Sabrina Morrison*, CV2013-004578 (Ariz. Super. Ct. 2013).  Her family alleged

in their complaint that MCSO failed to investigate the report that their child had been raped and

failed to arrest the suspect—who then went on to sexually attack her multiple times, ultimately

impregnating her.  *Id.*  The County reportedly paid $3.5 million to settle the suit.  Kody Acevedo,

*County to pay $3.5 million for botched MCSO probe*, The Arizona Republic (Apr. 8, 2015),

https://tinyurl.com/y6uab7lc.

### 9. Racial Profiling

The issue for which Arpaio is perhaps most widely known in recent years is the policing

practice of racial profiling and discriminatory targeting of Latinos.

### (a) 2011 DOJ Report

The Department of Justice opened an investigation into MCSO in 2008 pursuant to the

Violent Crime Control and Law Enforcement Act of 1994 and Title VI of the Civil Rights Act of

1964. *See* Letter from DOJ Civil Rights Division to Maricopa County Attorney (Dec. 15, 2011)

("2011 DOJ Report"), https://tinyurl.com/yaozxjw8.  DOJ stated:

> Based upon our extensive investigation, we find reasonable cause to
> believe that MCSO engages in a pattern or practice of unconstitutional
> policing. Specifically, we find that MCSO, through the actions of its
> deputies, supervisory staff, and command staff, engages in racial profiling
> of Latinos; unlawfully stops, detains, and arrests Latinos; and unlawfully
> retaliates against individuals who complain about or criticize MCSO's
> policies or practices, all in violation of Section 14141. MCSO's
> discriminatory police conduct additionally violates Title VI and its
> implementing regulations. . . . The absence of clear policies and
> procedures to ensure effective and constitutional policing, along with the
> deviations from widely accepted policing and correctional practices, and
> the failure to implement meaningful oversight and accountability
> structures, have contributed to a chronic culture of disregard for basic
> legal and constitutional obligations.

*Id.* at 2.  Among other things, DOJ found that Latino drivers were four to nine times more likely

to be stopped by MSCO than non-Latino drivers and that one-fifth of MSCO's own incident

reports for traffic stops by the Human Smuggling Unit indicated that the stops "were conducted

in violation of the Fourth Amendment's prohibition against unreasonable seizures."  *Id.* at 3.

DOJ concluded that "both data and witness statements show[ ] that MCSO deputies, in the

course of engaging in immigration-related enforcement activities, frequently stop or arrest

Latinos without either probable cause or reasonable suspicion." *Id.* at 18. DOJ also found that workplace raids were routinely premised on racial profiling, rather than any evidence of criminal activity, *id.* at 8, and that the raids were conducted in an unconstitutional manner: "[MCSO personnel] routinely raid businesses in a manner that harms innocent Latino workers. . . . [by] detain[ing] and investigat[ing] the immigration status of all employees at a raided worksite, whether or not the employees are listed in the warrant." *Id.* at 7-8; *see also id.* at 18. DOJ demanded that MCSO commit to significant changes in policies and practices. *Id.* at 20-21.

(b) *Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013)

Separately, Latino drivers and passengers brought a class action against Arpaio, MCSO, and Maricopa County in 2007, alleging that defendants had a "policy or practice" of racially profiling Latino drivers and passengers, and of pretextual stops under the auspices of enforcing federal and state immigration-related laws. *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 969 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (*Melendres I*). They alleged that the defendants implemented this policy "primarily during 'saturation patrols,' or 'crime suppression sweeps,' in which Defendant officers would 'saturate' a particular area and 'sweep' it, looking for violations of federal civil immigration laws and state immigration-related laws." *Melendres v. Arpaio*, 784 F.3d 1254, 1258 (9th Cir. 2015) (*Melendres II*) (alteration and citation omitted).

The court issued a preliminary injunction in 2011 ordering Arpaio and his deputies to stop targeting Latino drivers and enjoined him from "detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States." *Ortega-Melendres*, 836 F. Supp. 2d at 994. Among other evidence, the court cited Arpaio's public statements endorsing racial profiling, such as his statement that his officers could detain people based upon "their speech, what they look like, if they look like they came

from another country." *Id.* at 986-87.  The court also found that MCSO engaged in "special operations" against Latino areas without any concrete allegation of criminal activity and that MCSO officers circulated emails with racist jokes about Mexicans.  *Id.*

Following a bench trial, "the district court concluded that Defendants employed an unconstitutional policy of considering race as a factor in determining where to conduct patrol operations, in deciding whom to stop and investigate for civil immigration violations, and in prolonging the detentions of Latinos while their immigration status was confirmed." *Melendres II*, 784 F.3d at 1258.  The court granted broad injunctive relief.  The decision largely was upheld on appeal.  *See Melendres I*, 695 F.3d 990; *Melendres II*, 784 F.3d 1254.

> (c)     *United States v. Maricopa County*, 151 F. Supp. 3d 998
>         (D. Ariz. 2015)

DOJ also filed suit against Arpaio and Maricopa County, challenging the legality of the law enforcement policies and practices detailed in the 2011 DOJ Report and alleging a pattern or practice of discrimination against Latinos in Maricopa County in violation of the Constitution and federal statutes.  *See United States v. Maricopa Cty.*, 151 F. Supp. 3d 998, 1004 (D. Ariz. 2015), *aff'd* 889 F.3d 648 (9th Cir 2018), *cert. petition docketed sub nom. Maricopa Cty. v. United States*, No. 18-498 (Oct. 17, 2018).  The DOJ alleged that defendants engaged in racially "discriminatory vehicle stops  . . . . discriminatory home raids, worksite raids, and non-motor vehicle related arrests and detentions."  *Id.* at 1012.

The federal district court granted summary judgment to DOJ with respect to claims predicated on the traffic-stop policies also found unlawful in *Melendres*.  *Id.* at 1030, 1038.  These included "MCSO's performance of traffic stops in connection with purported immigration and human smuggling law enforcement, including 'crime suppression operations' and 'saturation patrols,' during which the officers unlawfully relied on race, color, or national origin, as well as

MCSO's use of Hispanic ancestry or race as a factor in forming reasonable suspicion that persons violated state laws." *Id.* at 1030. The court held that Arpaio and the County were barred from re-litigating the issues decided in the *Melendres* action, which by that point had reached final judgment. *Id.* at 1027-30. The Ninth Circuit affirmed. 889 F.3d 648.

### B.       Arpaio's Conviction For Contempt And Subsequent Pardon

As part of the proceedings in *Melendres*, Arpaio faced three charges of civil contempt. After 21 days of evidentiary hearings, the District Court found that Arpaio "intentionally failed to implement the Court's preliminary injunction in this case, failed to disclose thousands of relevant items of requested discovery . . . deliberately violated court orders" and that Arpaio "made multiple intentional misstatements of fact while under oath." The court found Arpaio in contempt on all three civil counts and referred Arpaio for an investigation of criminal contempt. 2:07-cv-02513-GMS, Dkt. No. 1 (Aug. 19, 2016 Order).

A second proceeding, for criminal contempt, occurred in October 2016. *United States v. Arpaio*, 2017 WL 3268180, at *1 (D. Ariz. July 31, 2017). Following a bench trial, the court found that Arpaio willfully violated a court order enjoining him from detaining any person based only on his or her immigration status. *Id.* at *6-7. The court found not only that Arpaio had violated the order, but that he repeatedly made public statements and gave interviews in which he asserted that he was and would continue to violate the order. *Id.* The court found Arpaio guilty of criminal contempt. *Id.* at *7.

Two months later, on August 25, 2017, President Donald Trump granted a pardon to Arpaio for the criminal contempt. *See* White House Press Release, *President Trump Pardons Sheriff Joe Arpaio* (Aug. 25, 2017), https://tinyurl.com/ycf4cnjc. The Pardon "granted [Arpaio] a full and unconditional pardon for his 'conviction' in this matter and for 'any other offenses ... that might arise, or be charged' with respect to the *Melendres* case." *United States v. Arpaio*,

2017 WL 4839072, at *1 (D. Ariz. Oct. 19, 2017).  The district court stayed Arpaio's sentencing

hearing and subsequently dismissed with prejudice all contempt proceedings against him.  *Id.* at

*2.

### C.       Arpaio's Candidacy For The United States Senate

On January 9, 2018, Arpaio announced via Twitter that he would seek election to the

United States Senate from Arizona.  *See* https://tinyurl.com/yaabj942.  Arpaio was one of five

candidates for the Republican nomination, but lost the primary to candidate Martha McSally.

*See* State of Arizona Official Canvass, 2018 Primary Election – Aug 28, 2018 (Sept. 10, 2018),

https://tinyurl.com/yd6yyagc at 1.

### **ARGUMENT**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Nurriddin v. Bolden*,

818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *cert.

denied*, 137 S. Ct. 2159 (2017).  "Determining whether a complaint states a plausible claim for

relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense."  *Iqbal*, 556 U.S. at 679.  In conducting this review, the Court

should not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts

set out in the complaint."  *Nurriddin*, 818 F.3d at 756 (alterations and citation omitted).  Nor

should the Court "accept legal conclusions couched as factual allegations."  *Id*.

As the D.C. Circuit recently explained, the task of promptly evaluating the legal

sufficiency of claims arising from protected speech—as here, where a national political figure

takes issue with a column published in *The New York Times*—is one with clear constitutional

ramifications:

> The First Amendment guarantees freedom of speech and freedom of the press. Costly and time-consuming defamation litigation can threaten those essential freedoms. To preserve First Amendment freedoms and give reporters . . . the breathing room they need to pursue the truth, the Supreme Court has [therefore] directed courts to expeditiously weed out unmeritorious defamation suits.

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir.), *cert. denied*, 138 S. Ct. 366 (2017). Because freedom of the press can be chilled by the burdens of litigation "even if a defendant ultimately prevails," courts in this district and elsewhere repeatedly have underscored that they "properly dispose of defamation cases against the news media through summary procedures when and as soon as possible." *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 111 (D.D.C. 2011) (citations omitted). Because each of his purported causes of action fails as a matter of law, Arpaio's Complaint should be dismissed forthwith.

## I.   ARPAIO'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW

On his first cause of action, for defamation, Arpaio ultimately bears the burden of proving, and currently bears the burden of adequately pleading:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Libre by Nexus*, 311 F. Supp. 3d at 154 (quoting *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140-41 (D.D.C. 2017) & *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)). All apart from the fact that Arpaio can neither adequately plead nor ever prove that the statements in the column about him are false, Arpaio's claim should be dismissed at this preliminary stage for the principal reason that he fails to allege facts that, if proven, could plausibly establish that The Times published any allegedly false factual statement in the column with the requisite level of fault. Moreover, given the extensive public record supporting the factual background as

summarized in the column, any opportunity to amend would be futile and dismissal should therefore be with prejudice.

### A.    Arpaio Is Required To But Has Not And Cannot Adequately Plead "Actual Malice" As To Any Challenged Statement

To prevail on a defamation claim, public officials or public figures must plead, and ultimately prove, by clear and convincing evidence, a level of fault referred to as "actual malice." This is a term of art requiring proof that "the defendant must have made the false publication with a 'high degree of awareness of ... probable falsity.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)); *see also N.Y. Times v. Sullivan*, 376 U.S. 254, at 279-80 (1964) (plaintiff must show challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."). This heavy burden arises from the "profound national commitment" to the debate of public issues, *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016) (quoting *Sullivan*, 376 U.S. at 270), *cert. denied*, 137 S. Ct. 1434 (2017), and reflects that those, such as Arpaio, who have chosen to seek or hold public office or participate in public debate, necessarily accept a greater risk of critical public scrutiny and commentary, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1278-79 (D.C. Cir. 2003). Put simply, Arpaio was required in his Complaint to plead facts that would plausibly establish, by clear and convincing evidence, that The Times published a "calculated falsehood" about him in the column. *Garrison*, 379 U.S. at 73-75. Not only has Arpaio failed plausibly to allege the falsity of any statement of fact in the column about him, he also fails entirely to set forth *any facts* that plausibly could support a finding of actual malice—nor could he, given the public record summarized above.[15]

---

[15] The actual malice standard is relevant only to statements of *fact*; pure statements of opinion can never support liability—regardless of the defendant's state of mind or level of

(continued...)

First, there can be no dispute that Arpaio qualifies as a public official for purposes of this lawsuit—courts repeatedly have held that county sheriffs and similar law enforcement officers are "public officials" for the purposes of defamation law. *St. Amant v. Thompson*, 390 U.S. 727, 730 & n.2 (1968) (deputy sheriff); *Sullivan*, 376 U.S. at 273 (public safety commissioner); *Beeton v. Dist. of Columbia*, 779 A.2d 918, 924 (D.C. 2001) (corrections officer). So are candidates for federal office. *E.g.*, *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271-72 (1971); *Manqual v. Rotger-Sabat*, 317 F.3d 45, 65-66 (1st Cir. 2003).[16]

Second, Arpaio has not even attempted in his Complaint to allege facts that, accepted as true, could support a jury finding that The Times deliberately published a falsehood about him in the column. More specifically, to satisfy Rule 8, a complaint must contain "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). This includes plausible factual allegations sufficient to show actual malice. *See, e.g.*, *Deripaska*, 282 F. Supp. 3d at 144 (dismissing claim where pleaded facts failed to establish "that [defendant] acted with actual malice"); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 144 (D.D.C.

---

(...continued)

fault—because "[u]nder the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974). As demonstrated in Section II.B *infra*, to the extent that Arpaio seeks to impose liability for statements of opinion, those claims fail because "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

[16] Arpaio also qualifies as a "limited purpose public figure." In this Circuit, a defamation plaintiff so qualifies if (1) there is a pre-existing public controversy, (2) the plaintiff played a significant role in that controversy, and (3) the challenged statements are germane to plaintiff's participation in the controversy. *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980). In light of Arpaio's extensive national advocacy for his policies of tough policing, *supra* at 7, the controversies over which were the subject of the column, he would easily meet this test as well. *See, e.g.*, *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987) (noting that "touchstone" of public figure analysis "remains whether an individual has 'assumed [a] role[ ] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment'" (quoting *Gertz*, 418 U.S. at 345)).

2016) (same), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262-63 (D.D.C. 2013) (same); *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218-19 (D.D.C. 2012) (same).

Here, Arpaio simply recites the bare, conclusory allegations that the statements at issue are false, Compl. ¶¶13, 15, 18, 23, 24, 26; that defendants published "with malice," Compl. ¶¶ 23, 24, 34, 42, and that defendants "knew that the statements made against Plaintiff Arpaio were false and/or recklessly disregarded their falsity," *id.* ¶ 28.  This is precisely the kind of "unadorned" and "[t]hreadbare recital[ ] of the elements of a cause of action" that fails to satisfy Rule 8.  *Iqbal*, 556 U.S. at 678.  A defamation complaint "us[ing] actual-malice buzzwords" that are not "backed by well-pled facts" cannot survive a motion to dismiss.  *Schatz v. Republican Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012); *Hourani*, 164 F. Supp. 3d at 143-44 (rejecting "conclusory allegations" of actual malice); *see also, e.g.*, *Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *8 (S.D.N.Y. Dec. 7, 2011) (dismissing claim where plaintiff's "repeated assertion" that defendant had published with actual malice was inadequate "legal conclusion" not supported by relevant facts).  It is not just that Arpaio's factual allegations are insufficient; rather, he has not even attempted to plead facts that would establish either the falsity of the challenged statements, or that The Times knew the statements were false or likely false but proceeded nonetheless to publish them.  On this basis, alone, the claim for defamation fails as a matter of law.

Moreover, the claim should be dismissed *with prejudice* because any opportunity to re-plead the element of actual malice necessarily would be futile in light of the extensive public record supporting the accuracy of every statement in the column.  Although the Complaint is unclear on precisely which factual statements are alleged to be false, Arpaio appears to premise his defamation claim on the following statements in the column:

> His 24-year reign of terror was medieval in its brutality. In addition to conducting racial profiling on a mass scale and terrorizing immigrant neighborhoods with gratuitous raids and traffic stops and detentions, he oversaw a jail where mistreatment of inmates was the stuff of legend. Abuses ranged from the humiliating to the lethal. He brought back chain gangs. He forced prisoners to wear pink underwear. He set up an outdoor "tent city," which he once referred to as a "concentration camp," to hold the overflow of prisoners. Inmates were beaten, fed rancid food, denied medical care (this included pregnant women) and, in at least one case, left battered on the floor to die.

> The number of inmates who hanged themselves in his facilities was far higher than in jails elsewhere in the country. More disturbing still, nearly half of all inmate deaths on his watch were never explained.

> At the same time, Mr. Arpaio's department could not be bothered to uphold the laws in which it had little interest. From 2005 through 2007, the sheriff and his deputies failed to properly investigate, or in some cases to investigate at all, more than 400 sex-crime cases, including those involving the rape of young children.

Compl. ¶ 25. Each of the categories of factual statements in this passage—relating to racial profiling, inmate abuses, chain gangs, pink underwear, a "tent city" prison, "rancid" food, denial of medical care, inmate suicides, and failures to investigate sex crimes—is demonstrably true as a matter of law in light of judicial records properly considered by the Court.[17]  But to the main

---

[17] That the challenged statements are indisputably true as a matter of law is an additional, independent basis on which the cause of action for defamation is properly dismissed. *See, e.g.*, *Libre by Nexus*, 2018 WL 6573281, at *3 (dismissing complaint where complaint "fails to allege facts that would support a plausible inference that Defendants' reporting … was false"); *Boley*, 950 F. Supp. 2d at 262-63 (granting special motion to dismiss where plaintiff failed to allege *facts* plausibly demonstrating falsity); *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 59 (D.D.C.

(continued...)

argument raised at this procedural juncture by The Times, each of these categories of factual

statements is supported by such extensive judicial and other public records, as well as prior news

reporting, that Arpaio could not possibly allege facts that could plausibly form the basis for a

finding that The Times published the statements despite either knowing them to be false or

knowing them to be "so inherently improbable that only a reckless man would have put them in

circulation." *St. Amant*, 390 U.S. at 732; *see also Jankovic*, 822 F.3d at 589 ("[I]t is not enough

to show that defendant should have known better; instead, the plaintiff must offer evidence that

the defendant in fact harbored subjective doubt.").  As set out more fully in the Background

section above, The Times published the statements in question in light of and in many instances

referencing the following:

- **Racial Profiling**.  It is an adjudicated fact that Arpaio engaged in widespread

racial profiling, unconstitutionally targeting Latinos during traffic stops and "saturation sweeps"

based on race, rather than any evidence of criminality.  *See supra* at 23-26; *see, e.g.*,

*Melendres I*; *Melendres II*; *United States v. Maricopa Cty.*, 151 F. Supp. 3d at 1029-31.  Indeed,

Arpaio's continued violation of the injunctive relief granted in *Melendres* was one of the bases

for finding him in civil contempt, and for his conviction for criminal contempt.  *Arpaio*, 2017

WL 3268180, at *1 (contempt citation).  Moreover, a DOJ investigation concluded that MSCO,

under Arpaio's command, also engaged in racially discriminatory and unconstitutional home

raids, worksite raids, and non-motor vehicle-related arrests and detentions.  2011 DOJ Report;

*see also United States v. Maricopa Cty.*, 151 F. Supp. 3d at 1012.  These racially discriminatory

---

(...continued)
2012) (granting motion to dismiss defamation claim where "the statements are not capable of
conveying a defamatory meaning because they are substantially true" based on judicial records),
*aff'd*, 553 F. App'x 1 (D.C. Cir. 2014).

police tactics, implemented under Arpaio's command, have been the subject of more than a decade of litigation and news reporting.[18]  Given this public record, the statement in the column that Arpaio "conduct[ed] racial profiling on a mass scale and terroriz[ed] immigrant neighborhoods with gratuitous raids and traffic stops and detentions" may properly be deemed substantially true as a matter of law.  But, even if the Complaint had adequately *alleged* the falsity of the statement, in light of this public record Arpaio could not possibly allege facts that would establish that The Times published the statement despite having a "high degree of awareness of its probable falsity."

- **Abuses, Assaults, and Deaths of Inmates in MCSO custody**.  Both state and federal courts have concluded that Arpaio personally was deliberately indifferent to inmates' risk of serious injury in Tent City.  *See Flanders*, 54 P.3d at 846; *Wilson*, 463 F. Supp. 2d at 994.  Arpaio himself *admitted* intentionally designing conditions that created an unsafe environment in which inmates suffered violent attacks from other inmates, leading to serious injury and in some cases death.  *See supra* at 9-10.  In addition, dozens of lawsuits filed against Arpaio alleged that detainees suffered violence and abuse at the hands of MCSO officers under Arpaio's control, leading to serious injury and in some cases death.  *See supra* at 8-19.  In most cases, Maricopa County settled claims prior to trial, sometimes for millions of dollars.  *See id.*

---

[18] *See, e.g.*, Ray Stern, *Mesa Police Chief George Gascon stares down Sheriff Joe Arpaio*, Phoenix New Times (July 10, 2008), https://tinyurl.com/y7lsopae ("The sheriff's enforcement efforts . . . have been little more than roundups of Mexicans and anybody who looks Mexican. . . . The heavy-handed tactics have brought accusations of racial profiling from civil rights leaders and Phoenix Mayor Phil Gordon."); Stephen Lemons, *Guadalupe made it clear that Joe Arpaio's attacking anyone with brown skin*, Phoenix New Times (Mary 29, 2008), https://tinyurl.com/ycqahx3t (reporting on widespread criticism of Arpaio's anti-immigrant "sweeps" including by Arizona Governor Janet Napolitano, and calls for a DOJ investigation and Congressional inquiry); Announcement of 2009 Pulitzer Prize Winners for Local Reporting: Ryan Gabrielson and Paul Giblin of *East Valley Tribune*, Mesa, AZ, www.pulitzer.org (2009), https://tinyurl.com/yckry6yu.

In several of those cases, evidence produced in discovery—including surveillance footage from within MCSO jails—revealed that detainees died after being beaten, hit with electrical charges from Taser guns, or crushed under "dogpiles" of MCSO officers and then left on the floor, where they died. *See, e.g.*, *Atencio*, 161 F. Supp. 3d at 796; *see also supra* at 15-18.  In at least one case, a jury found that MCSO officers under Arpaio's control caused the death of a mentally handicapped detainee when they violently restrained him. *Agster*, 486 F. Supp. 2d at 1009-10.[19]  Given this record—which is a sufficient basis on which to find the statement in question substantially true as a matter of law—at a minimum, Arpaio cannot conceivably plead facts that would demonstrate the statements regarding detainee abuses were published by The Times with a "high degree of awareness of their probable falsity."

- **Chain Gangs, Pink Underwear, and "Tent City."**  For more than two decades Arpaio touted his reintroduction of chain gangs, boasting that he operated the only female chain gang in the world, and this practice was the subject of multiple documentaries and broadcasts in which Arpaio frequently appeared. *Supra* at 19-20.  Arpaio similarly publicized his introduction of pink underwear: hundreds of articles and broadcasts reported on the undergarments, Arpaio gave multiple interviews about the practice, and he even sold replicas of inmates' pink underwear to fundraise for law enforcement activities. *Id.*  The pink underwear is also a matter of judicial record. *See Wagner*, 747 F.3d at 1051.  Similarly, the existence of and dangerous conditions in Tent City are a matter of court record. *See Flanders*, 54. P.3d at 846.  Arpaio actively publicized Tent City—a jail of which he was so proud that he celebrated its creation with an annual party.  A video recording of Arpaio's characterization of Tent City as a

---

[19] Numerous other allegations of abuse and assault by MCSO officers have been widely reported in local and national media. *See supra* at 5-19 and nn. 5, 7, 11, 13, 14.

"concentration camp" is publicly available.  Given the foregoing, it is literally frivolous for Arpaio to attempt to state clams for defamation based on these statements in the column.

- **"Rancid" Food.**  A federal court found that detainees under Arpaio's supervision were "often given food that is overripe, moldy, and generally inedible."  *Graves*, 623 F.3d at 1050.  *Graves* was only one of many lawsuits alleging MCSO jail food was spoiled, rotten, or inedible.  Indeed, Arpaio publicly took pride in the poor quality of MCSO jail food, repeatedly claiming in the press that he served "green bologna" and spent more money on dog food than prisoners' meals.  *See supra* at 10-11.  Given the foregoing, the column's statement that MCSO jail food was "rancid" is once again both substantially true and in any event supported by such an extensive public and judicially noticeable record that Arpaio could not conceivably plead facts demonstrating that The Times published it despite having a "high degree of awareness of its probable falsity."

- **Denial of Medical Care.**  It is an adjudicated fact that detainees were denied adequate medical care during Arpaio's tenure as sheriff, sufficient to constitute a violation of constitutional rights.  *See Graves*, 2008 WL 4699770, at *27-29; *Graves*, 48 F. Supp. 3d at 1341-42, 1346-48.  Federal courts have found, among other things, that detainees did not receive critical medication on time, did not receive medical appointments on time, were not appropriately screened for health conditions, were denied access to adequate mental health and dental care, and were not appropriately segregated and treated for physical and mental illnesses.  *See supra* at 12-15.  In addition, numerous lawsuits have alleged that denial of medical care or inadequate medical care led to serious injury and even death in custody.  *See id.*  At least three pregnant detainees have alleged in legal proceedings that MCSO denied them access to adequate medical care—in one case allegedly resulting in stillbirth.  *See id.* at 13-15.  In many of those

cases, Maricopa County reportedly paid substantial sums to settle claims.  As such, the statement in the column that "[i]Inmates were . . . denied medical care (this included pregnant women)" is both literally true and, at a minimum, is supported by such an extensive judicially noticeable public record that Arpaio could not conceivably plead facts demonstrating it was published with a "high degree of awareness of its probable falsity."

• **Detainee Deaths.**  Government records from the Office of the Maricopa County Medical Examiner, the Office of Risk Management, and the DOJ BJS all demonstrate that prisoners in Maricopa County committed suicide at significantly higher rates than in other comparable large jurisdictions such as New York and Los Angeles.  In 2015, the *Phoenix Sun Times* further reported that, according to Maricopa County coroner's records, 73 of 157 detainees deaths in MCSO custody were classified as having no explanation.  *See Prisoners Hang Themselves in Sheriff Joe Arpaio's Jails at a Rate That Dwarfs Other County Lockups*, https://tinyurl.com/y7saw5ds (reporting that 24% of inmate deaths were by suicide).  Given the foregoing, the statement in the column that "[t]he number of inmates who hanged themselves in [Arpaio's] facilities was far higher than in jails elsewhere in the country" and that "nearly half of all inmate deaths on [Arpaio's] watch were never explained" is substantially true as a matter of law, and, at a minimum, supported by such a vast, judicially noticeable public record that Arpaio could not conceivably plead facts demonstrating it was published with a "high degree of awareness of probable falsity."

• **Failure to Investigate Sex Crimes.**  Government records, a DOJ report, court pleadings, statements by MCSO representatives, and Arpaio's own public statements all support the assertion that MCSO failed adequately to investigate hundreds of sex-crime cases from 2005 through 2007.  *See supra* at 21-23.  As was widely reported, MCSO itself admitted in 2011 that

more than 400 sex crime cases had been inadequately investigated or not investigated at all during that period.  Members of City of El Mirage law enforcement—where many of the cases occurred—repeatedly have spoken out regarding MCSO and Arpaio's failure to investigate the crimes, which included sexual assault of young children.  *Id.*  Given the foregoing, the statement in the column that, "[f]rom 2005 through 2007, the sheriff and his deputies failed to properly investigate, or in some cases to investigate at all, more than 400 sex-crime cases, including those involving the rape of young children," once again is both substantially true as a matter of law, and, at a minimum, supported by such an extensive, judicially noticeable public record that Arpaio could not conceivably plead facts demonstrating it was published with a "high degree of awareness of probable falsity."

## II.     ARPAIO'S TAG-ALONG CLAIMS ALSO FAIL AS A MATTER OF LAW FOR MULTIPLE REASONS

### A.     Both Tag-Along Claims Fail For The Same Reasons As The Defamation Claim

The same constitutional prerequisites of adequately pleading and ultimately proving falsity and fault apply regardless of whether a claim based on speech is styled as one for defamation or pleaded as false light invasion of privacy or tortious interference with prospective business relations.  *Farah*, 736 F.3d at 540 (because plaintiffs' "defamation claim fails, so do their other tort claims based upon the same allegedly defamatory speech" because "[t]he First Amendment considerations that apply to defamation . . . apply also to [plaintiffs'] counts for false light and tortious interference"); *see also, e.g.*, *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1151 (D.C. Cir. 1994) ("[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion."); *Thompson v. Armstrong*, 134 A.3d 305, 310-11 (D.C. 2016) (citing authority and adopting rule that "First Amendment restrictions apply to suits for intentional interference with contractual relations"

because "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim"); *White v. Fraternal Order of Police*, 909 F.2d 512, 525 (D.C. Cir. 1990) ("Because White concededly is a public figure, malice is also an element of the defamation tort . . . and, by definition, is part of the false light tort.").

The causes of action for tortious interference and false light expressly are based in part on the same statements at issue in the defamation claim, *see* Compl. ¶¶ 31, 40, and the arguments set forth in section I *supra*, apply equally to this attempt to re-plead the defamation claim in the guise of other torts.

But these tag-along causes of action apparently also are premised on additional statements in the column:

> Joe Arpaio, the former sheriff of Maricopa County, Ariz., who so robustly devoted himself to terrorizing immigrants that he was eventually convicted of contempt of court and would have lived out his twilight years with a well-deserved criminal record if President Trump, a staunch admirer of Mr. Arpaio's bare-knuckle approach to law enforcement, had not granted him a pardon.

> Cast aside and left to wallow in the knowledge that his moment has passed, he has a fitting end to the public life of a true American villain.

> It was no secret that Mr. Arpaio's methods often crossed the line into the not-so legal.

> For nearly a quarter-century, Sheriff Joe Arpaio was a disgrace to law enforcement, a sadist masquerading as a public servant. In a just system, we would not see his like again.

Compl. ¶ 31 (incorporating, *inter alia*, ¶ 17), ¶ 40.[20]  Arpaio conclusorily alleges that these statements are "misleading and false," and "made with malice."  Comp. ¶¶ 41-42.  Simply put, Arpaio makes no attempt whatsoever to allege *facts* that would support a finding that these

---

[20] It is unclear, but Arpaio may also mean to base these causes of action on the additional statement, "His 24-year reign of terror was medieval in its brutality[,]" Compl. ¶¶ 31, 40, which The Times did not address in section I *supra*, but addresses *infra*.

additional statements were published by The Times with actual malice, that is, with knowledge

that any of them is "false."  This alone is sufficient ground for dismissal of the two tag-along

claims to the extent premised on additional statements beyond those on which the defamation

claim was premised.  And, for the further reasons set forth below, there is no basis on which

Arpaio could amend his Complaint to adequately plead either of these causes of action based on

these additional statements.

> **B.      To The Extent They Are Premised On Additional Statements, Both Tag-Along Claims Fail Because Those Statements Are Non-Actionable Opinion**

The additional statements from the column challenged in the second and third causes of

action are non-actionable as a matter of law because they are either expressions of "pure"

opinion or statements of opinion based on disclosed facts.  As such, there is no basis on which

Arpaio could re-plead this portion of his claims, and they should be dismissed with prejudice.

A statement on a matter of public concern "must be provable as false before there can be

liability under state defamation law, at least in situations, like the present, where a media

defendant is involved."  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *see also*

*White*, 909 F.2d at 522 ("a statement of opinion having no provably false factual connotation is

entitled to full constitutional protection").  In addition, "statements that cannot reasonably be

interpreted as stating actual facts about an individual" are not subject to liability.  *Milkovich*, 497

U.S. at 20 (internal marks, alteration and citation omitted).  "In other words, a defendant cannot

be held liable unless the alleged defamatory statement or implied premise is 'verifiable.' . . .

Where a statement is so imprecise or subjective that it is not capable of being proved true or

false, it is not actionable in defamation."  *Farah*, 736 F.3d at 534-35 (internal citations omitted).

In assessing whether a challenged statement constitutes non-actionable opinion, a court must

consider the statement in its full context, including the specific publication and the broader

40

context in which it was published – here, a column published in the Opinion section of *The New York Times*. *See Moldea v. N.Y. Times Co.*, 22 F.3d 310, 314-15 (D.C. Cir. 1994).

The Times's characterizations of Arpaio's activities as "medieval," "brutal," and "bare-knuckle" and of Arpaio as "a disgrace," "a sadist" and "a true American villain," and its suggestion that, "[i]n a just system, we would not see his like again," are precisely the kind of "rhetorical hyperbole" that the Supreme Court has held to be protected. *Milkovich*, 497 U.S. at 20 (citation omitted); *see also Ollman v. Evans*, 750 F.2d 970, 987 (D.C. Cir. 1984) (finding unverifiable "a loosely definable, variously interpretable statement of opinion made inextricably in the contest of political, social or philosophical debate" (alterations and citation omitted)); *White*, 909 F.2d at 522 (noting that *Milkovich* test "is intended to protect the use of 'loose, figurative or hyperbolic language' which would preclude an impression that the author was seriously maintaining a provable fact"); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 249 (D.D.C. 2016) (statement that plaintiff was behind "one of the most elaborate and dangerous hoaxes in American history" was "a quintessential example of a subjective opinion."), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 620-21 (D.D.C. 2001) (dubbing politician "Robespierre of the Right" and asserting he suffered "paranoia" not reasonably understood as "verifiably false, and, therefore potentially actionable, assertion[] of mental derangement"). None of these evaluative statements is capable of objective proof; "statement[s] of opinion having no provably false factual connotation" are nonactionable and "entitled to full constitutional protection." *White*, 909 F.2d at 522. Nor did they state "actual facts" about Arpaio; clearly the column was not asserting that Arpaio was in fact a "bare knuckle" boxer or from the Medieval era. Rather, they are precisely "the kind of hyperbole that must be accepted in the rough and tumble of political argument." *Ollman*, 750 F.2d at 998 (Bork, J., concurring).

Both the narrower and broader contexts of the additional statements challenged in the tag-along claims also confirm that they are non-actionable. *See Farah*, 736 F.3d at 535 ("To determine whether [defendants'] statements could reasonably be understood as stating or implying actual facts about [plaintiffs] . . . the publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed." (internal marks and citation omitted)). The statements at issue were made in a column published in the Opinion section of *The New York Times.* Compl. ¶ 13 & Ex. 1. *See Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 582-83 (D.C. 2000) (Op-ed generally entitled to high level of protection as opinion). The column was drafted in a witty and occasionally hyperbolic style, signaling to the reader that its more colorful turns of phrase were not to be taken literally.

Additionally, and in the alternative, both the above-quoted hyperbolic statements and the statements that Arpaio engaged in a "24-year reign of terror," "devoted himself to terrorizing immigrants," had a "well-deserved criminal record," had suffered "a fitting end to public life," that "abuses ranged from the humiliating to the lethal," and that it was "no secret" his "methods often crossed the line into the not-so-legal," are not actionable because they constitute expressions of opinion based on disclosed facts. As the column made clear, those conclusions and assertions were premised on facts drawn from the judicially noticeable public record:

- Under Arpaio's leadership, police conducted racial profiling on a mass scale, including gratuitous raids and traffic stops and detentions;

- Arpaio oversaw a jail where mistreatment occurred;

- Arpaio brought back chain gangs, forced prisoners to wear pink underwear, and created an outdoor "tent city" prison that he dubbed a "concentration camp";

42

- inmates under Arpaio's supervision were beaten, fed rancid food, denied medical care, and, in at least one instance, left "battered on the floor to die";

- prisoners under Arpaio's supervision committed suicide at higher rates than in other jails, and many inmate deaths were unexplained;

- Maricopa County paid out millions in settlements relating to MCSO's conduct; and

- MCSO under Arpaio's supervision failed to investigate hundreds of sex crimes.

*See* Compl., Ex. 1.  Where the factual basis for a conclusion is outlined in the publication itself, the conclusion is protected by the First Amendment as a non-actionable expression of opinion. *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 16 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015); *see also Moldea*, 22 F.3d at 317 (where "the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation" (citation omitted)); *Deripaska*, 282 F. Supp. 3d at 141 ("[I]f it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." (quoting *Guilford*, 760 A.2d at 597)); *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993) ("[A]ccusations of criminality could be regarded as mere hypothesis and therefore not actionable if the facts on which they are based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts.").

In short, all of the remaining disputed statements in the column are non-actionable expressions of opinion or opinion based on disclosed facts.

**CONCLUSION**

For each and all the foregoing reasons, defendants respectfully request that this Court grant their motion and enter an order dismissing the Complaint, with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated:  January 4, 2019                                    Respectfully submitted,

**BALLARD SPAHR LLP**

  */s/ Jay Ward Brown*
Jay Ward Brown (D.C. Bar No. 437686)
Chad R. Bowman (D.C. Bar No. 484150)
Dana R. Green (D.C. Bar No. 1005174)
1909 K. Street, NW, 12th Floor
Washington, D.C. 20006-1157
Telephone:  (202) 661-2200
Fax:  (202) 661-2299
brownjay@ballardspahr.com
bowmanchad@ballardspahr.com
greendana@ballardspahr.com

*Attorneys for Defendants*